IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SANDRA LEE,

       Plaintiff,

vs.                                                  No. CIV 97-944 MV/LCS

NEW MEXICO BOARD OF REGENTS,
et al.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment Regarding Retaliatory Discharge, filed December 10, 1999 **[Doc. No. 53]**.  The Court, having considered the briefs, relevant law and being otherwise fully informed, finds that the Motion for Summary Judgment is not well taken and will be **DENIED** as explained below.

## FACTUAL BACKGROUND

The Court finds the following material facts to be undisputed:[1]

1.     Plaintiff Sandra Lee was employed by the New Mexico State University (NMSU) at its Dona Ana Branch Community College (DABCC) as an assistant professor teaching English in the Developmental Studies Division.

2.     Plaintiff was placed on a tenure track position calling for annual reviews between 1989 and 1994 and a tenure track decision in 1995.

---

[1]    The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

3.     For the first three years of her employment, Plaintiff was under the supervision of the Developmental Studies Division Head, Monica Torres.  On the annual supervisor's evaluations for the first three years of tenure review (1989, 1990, 1991) Plaintiff met all 28 evaluated standards, exceeded standards on three rating categories, and was not rated as needing improvement in any category.

4.     Commencing in 1992, Plaintiff was under the supervision of Ann Rehovec, the new Developmental Studies Division Head.  That year Plaintiff was rated by Ms. Rehovec as meeting standards in all 28 evaluation categories and exceeding standards in five categories.  She was not rated as needing improvement in any category.  As to concerns, the evaluation noted "none at this time."  In the 1993 annual review performed by Ms. Rehovec, Plaintiff was rated as meeting standards in 24 categories, exceeding standards in 4 categories and needing improvements in no categories.

5.     The performance evaluation form states "[s]upervisor will provide narrative comments addressing strengths and weaknesses in the area of teaching, professional service and other service.  Areas of concern must be accompanied by relevant suggestions for improvement." In 1989, then-supervisor Monica Torres suggested that Plaintiff "get additional training in composition theory and practice" and "develop workshops...to disseminate information to her peers."  In 1990, Monica Torres suggested that Plaintiff participate in activities aimed at composition theory and collaborative learning.  In 1991, Monica Torres suggested that Plaintiff attend a national conference.  In 1992, the recommendation to attend a national conference in Plaintiff's discipline was again raised.  There is a dispute of fact as to whether or not Plaintiff complied with or heeded the recommendations and suggestions.  For instance, in response to the

1989 recommendation to "get additional training in composition theory and practice," Plaintiff subsequently took several courses which she alleges concentrated heavily on the theories and practices of composition pedagogy. Defendants dispute that the courses taken by Plaintiff adequately focused on composition pedagogy. Plaintiff also states that she did not attend national conferences in 1991 and 1992 due to the demands of raising a small child. She did, however, attend a national conference in 1994. With regard to Defendants' contention that Plaintiff did not work actively with her peers and colleagues, Plaintiff was commended in several of her annual recommendations for her active involvement in professional associations. Plaintiff was also praised for her favorable student evaluations, her instructional skills and the innovative collaborative learning techniques she was utilizing in the classroom.

6.     In August 1994, a position for an English Coordinator opened up at DABCC. Two males were interviewed for the position including the successful candidate, Dr. Aubrey Kline. Plaintiff was not offered an interview for the position, although she contends that she was at least as qualified as one of the candidates interviewed. She allegedly was informed by her supervisor Ms. Rehovec that enough women faculty were employed in coordinator positions. Plaintiff concedes that the candidate ultimately chosen had superior credentials to her own.

7.     In September 1994, Plaintiff filed an EEOC complaint alleging gender discrimination for the failure to interview her for the English Coordinator position. No claims were pursued by Plaintiff or the EEOC regarding the alleged gender discrimination.

8.     After filing the 1994 EEOC charge, Plaintiff alleges that she was subject to a series of retaliatory actions by her supervisor, Ms. Rehovec. Specifically, Plaintiff alleges that she was subject to heightened scrutiny by her supervisor and others, differential treatment and unfair

criticism.  The retaliation eventually culminated in a negative tenure recommendation, the denial of Plaintiff's tenure application, an adverse salary action, and finally, the termination of her employment.

9.      Within days of the EEOC filing, Ms. Rehovec ordered that Plaintiff's student papers be shredded, contravening standard university practice of letting the papers remain for the academic year.  Plaintiff also alleges that she was subject to heightened supervision following the filing of the EEOC charge. Ms. Rehovec began documenting the times when Plaintiff missed or was late to a meeting.  In December, 1994, when Plaintiff missed a meeting due to commitments at a prison project facilitated by the university, Ms. Rehovec requested verification that Plaintiff was indeed unavoidably delayed at the prison.  Ms. Rehovec also began questioning Plaintiff's teaching assignments at the prison, noting scheduling difficulties despite the fact that the schedule had previously been approved by Ms. Rehovec.  No other employee was subject to similar treatment.

10.     In the 1994 Annual Faculty Performance Report completed by Ms. Rehovec, Plaintiff was rated as meeting standards in 22 categories, exceeding standards in three categories, and for the first time, needing improvement in two categories.[2]  In addition, the 1994 evaluation completed by Ms. Rehovec raised a number of criticisms going back to 1989 - a time when Ms. Rehovec was not employed as Plaintiff's supervisor.  Ms. Rehovec compiled this evaluation by reviewing Plaintiff's past evaluations.  There is a dispute of fact whether the suggestions and recommendations raised in these past evaluations had been fully addressed by Plaintiff.  No other employee received an annual evaluation which engaged in this scrutiny of past evaluations.

---

[2]      It is not clear from the facts in which categories Plaintiff was rated as needing improvement.

4

11.     After receiving a draft of the 1994 evaluation, Plaintiff filed a second EEOC charge claiming retaliation for filing the initial EEOC charge.  The matter of the 1994 evaluation was taken to mediation.  Plaintiff pointed out that while Ms. Rehovec had referenced the prior annual evaluations, she had not reviewed Plaintiff's responses addressing the concerns raised in those evaluations.   As a result of the mediation the evaluation was eventually amended to be more favorable to Plaintiff.  Nonetheless, the "needs improvement" rating in two categories remained.

12.     Following the filing of her second EEOC charge, Plaintiff was subject to even closer supervision as demonstrated by a series of memoranda and notes documenting the times when Plaintiff was moments late for a meeting, left a meeting for a few minutes or was absent from a  meeting.  Such documentation was kept in a special file.  For example, on March 9, 1995, Ms. Rehovec created a memorandum stating "example of habit Ms. Lee has of having class during meeting time: 4 trips to room 7: in a two-hour class period."  Some of Plaintiff's co-workers were also asked by Ms. Rehovec to give informal evaluations of Plaintiff.   Notwithstanding this close monitoring, Plaintiff's attendance was comparable to that of her fellow employees.

13.     Plaintiff also alleges that Ms. Rehovec retaliated by submitting incomplete transcripts to Professor Dasenbrock when asking him to evaluate Plaintiff's qualifications to teach a certain English class.  Based upon the incomplete transcripts, Professor Dasenbrock wrote a memorandum concluding that Plaintiff was not qualified to teach the English course.  This document was later used by Ms. Rehovec as evidence of Plaintiff's inadequate qualifications.

14.     Under the tenure recommendation and review process at NMSU and DABCC, a tenure applicant must go through several stages of review.  First, the applicant's direct supervisor

(Ann Rehovec) drafts a recommendation. Then the applicant's credentials are reviewed by the Promotion and Tenure ("P&T") Committee. The P&T Committee then makes its recommendation to the Campus Director (Dr. Jim McLaughlin). The Campus Director then makes his recommendation to the Dean of the College of Human and Community Services (Virginia Higbie). The Dean then makes her recommendation to the Executive Vice-President (William Conroy), who makes his recommendation to the President of NMSU (Michael Orenduff). Based on all these recommendations, the President of NMSU issues the final tenure decision. The applicant then has the opportunity to appeal an adverse tenure decision to an independent Appeals Board.

15.     In each year between 1989 and 1994, the P&T Committee had rated Plaintiff as meeting all standards toward a grant of tenure. In 1995, when Plaintiff came up for tenure review, the P&T Committee unanimously recommended in favor of tenure.

16.     On October 3, 1995, Ms. Rehovec gave Plaintiff a negative tenure recommendation. Ms. Rehovec had circumvented the normal university tenure procedures by issuing this recommendation to the P&T Committee without giving Plaintiff an opportunity to respond. Plaintiff did not receive a copy of this negative recommendation until three months later. The negative tenure recommendation alleged (1) Plaintiff lacked focused direction in professional development; (2) Plaintiff had not demonstrated improved instruction performance; (3) Plaintiff did not heed recommendations to improve herself in the area of composition pedagogy; (4) Plaintiff's contributions and attendance in the area of community service were uneven and sporadic. Plaintiff disputes the substance of these allegations.

17.     According to one P&T Committee member, the P&T Committee was surprised to

6

see a negative tenure recommendation because over the six years of annual reviews, there was no indication that a negative tenure decision was possible.  The Committee was also surprised to see the negative recommendation without a rebuttal having been filed by Plaintiff.  The Committee assumed that Plaintiff had chosen not to reply to the negative allegations.

18.     The P&T Committee carefully scrutinized the grounds enumerated in Ms. Rehovec negative tenure recommendation, considered a rebuttal eventually submitted by Ms. Lee and concluded that Ms. Rehovec's assessment was totally groundless.  For example, with regard to Ms. Rehovec's allegation that Plaintiff had not heeded recommendations to get additional training in composition theory and practice, one Committee member observed that Plaintiff had among the strongest backgrounds in rhetorical composition of all the faculty.  After this review, the P&T Committee again recommended tenure for Plaintiff.  The second P&T Committee recommendation contained a provision designed to address what the Committee perceived to be ongoing personality differences between Ms. Rehovec and Plaintiff.

19.     On February 23, 1996, upon receiving the negative tenure recommendation of Ms. Rehovec and the two positive tenure recommendations from the P&T Committee, Dr. McLaughlin, the Campus Director, wrote a negative tenure recommendation advising against tenure for Plaintiff.  In the recommendation Dr. McLaughlin stated, "I have seen an unwillingness on the part of Ms. Lee to recognize the need for or accept the professional development recommendations made by two successive division heads."  Dr. McLaughlin added "Documentation of substantial levels of contribution or leadership is lacking....Reports to me from key project leaders on the Title III team suggest that her contributions were minimal and not consistent with the level of effort and expectation of a tenurable faculty member."  In his

testimony at a state court trial, Dr. McLaughlin emphasized that he was particularly concerned with the recommendations to gain "additional expertise in the pedagogy of how to teach composition" made by the division heads and that he felt that these concerns were not addressed by Plaintiff.

20.     Dr. McLaughlin indicated in his trial testimony that he placed the recommendation of the Ms. Rehovec above the recommendation of the P&T Committee because the division heads are "subject matter experts" and "we did not have many developmental English people who were eligible to sit on the Promotion and Tenure Committee because they were not tenured." However, one member of the P&T Committee noted that although P&T recommendations are non-binding they are generally considered among the strongest recommendations in the tenure process.

21.     The Dean of the College of Humanity and Community Services, Virginia Higbie also recommended against tenure based upon "insufficient evidence of continuous progress over the probationary period" and a concern regarding Plaintiff's "consistent meaningful contribution to committee work and projects at the college level."

22.     After the negative recommendations by Ms. Rehovec, Dr. McLaughlin and Dean Higbie, Plaintiff also received negative recommendations against tenure from the Executive Vice-President and the NMSU President.  Plaintiff was notified on March 20, 1996 that her application for tenure had been denied and that her contract would not be renewed beyond May 1997.

23.     Plaintiff filed an appeal from the denial of tenure before the Appeals Board. Plaintiff submitted a grievance memorandum which documented the reasons justifying tenure. Although Plaintiff did not mention the September 1, 1994 EEOC filing in her grievance

memorandum to the Appeals Board, there was other documentation of the filing in the materials reviewed by the Board.  As part of its review, the Appeals Board consulted Dr. McLaughlin who again recommended against tenure.  After conducting a review, the Appeals Board determined that there was no procedural error justifying reversal of the decision to deny tenure.  The Board of Appeals denies that its decision was influenced in any manner by Plaintiff's EEOC claims.

24.    In February 1997, Dr. Aubrey Kline, the English Department Coordinator who worked with Plaintiff on a daily basis, wrote a letter to the DABCC administration commenting on what he perceived to be differential treatment of Plaintiff.  Specifically, Dr. Kline observed that Ms. Rehovec unfairly criticized Plaintiff, as well as unfairly targeted her absences from departmental meetings despite that fact that Plaintiff's attendance was better than at least two other faculty members.  Dr. Kline also observed that Plaintiff's students had among the highest exit exam pass rates.  Dr. Kline noted that on numerous occasions, Ms. Rehovec requested unofficial information about Plaintiff's performance.  It is Dr. Kline's opinion that Plaintiff should have been granted tenure - an opinion which he had previously shared with Ms. Rehovec.

25.    Plaintiff's expert witness, Dr. David Harris, a professional educator, has made the following conclusions: (1) there is a lack of necessary and sufficient evidence to support he denial of tenure; (2) there are violations of the university's policies and procedure manual; (3) the P&T Committee recommendations were not given adequate weight based on national standards; (4) the annual evaluations show that Plaintiff was making normal progress toward tenure.

26.    Plaintiff also claims she was subject to an adverse rate of pay action.  During Plaintiff's final year of teaching, after her denial of tenure, Plaintiff received a 1.35% pay raise, while all other instructors received a 2% pay raise.  Plaintiff eventually arrived at an agreement

with Dr. McLaughlin whereby she would receive a 1.75% pay increase.[3]

27.     After being denied tenure, Plaintiff filed an EEOC charge claiming retaliation in violation of Title VII of the Civil Rights Act of 1964.  Plaintiff alleges that Ms. Rehovec's negative tenure recommendation tainted Plaintiff's tenure application in the perception of the administrative chain of command, culminating in the denial of tenure and the termination of her employment.  According to Plaintiff, despite the two positive P&T Committee tenure recommendations, Ms. Rehovec's negative tenure recommendation was interpreted by university officials as indicating something less than what was required from a tenure candidate.

28.     Plaintiff filed a complaint for breach of contract and violation of civil rights in state district court on June 16, 1997.  Defendants removed the entire action to federal court on July 14, 1997.  The Court subsequently remanded the breach of contract claim to the state district court, and retained jurisdiction over the Title VII claims and the state civil rights claims arising under the New Mexico Human Rights Act.  All proceedings in the federal court action were stayed pending the outcome of the state court proceeding.  After a state court trial in May 1999 the jury found against Plaintiff on her breach of contract claims.

## LEGAL STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party,

---

[3]     Defendants point out that the ultimate pay differential was only $68.98 for the 1996-1997 academic year.  Notwithstanding this minimal salary discrepancy, the amount of pay differential is not dispositive for an adverse rate of pay claim.

determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

## DISCUSSION

Section 704(a) of Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee "...because he has opposed any practice made an unlawful employment practice by this [title]...." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie violation of retaliation pursuant to §704(a) the plaintiff must demonstrate that there was (1)

protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activities; and (3) a causal connection between such activity and the employer's adverse action.  *See Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996).  The *McDonnell Douglas* burden shifting analysis sets forth the legal standard to be applied to a Title VII retaliation claim.  *Id.*;  *see also McCue v. State of Kansas*, 165 F.3d 794, 798 (10th Cir. 1999).  In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of her prima facie case of retaliation.  *Id.*; *see also Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.*  The plaintiff then has the burden to demonstrate that the defendant's offered reasons are mere pretext for discrimination - that is, unworthy of belief. *Id.*  If the plaintiff proffers such evidence, the motion for summary judgment must be denied.  *Id.*

Defendants move for summary judgment on the grounds that (1) Plaintiff has failed to meet her burden of proving each element of a prima facie case of retaliation under Title VII; (2) Defendants have offered a legitimate non-discriminatory justification for her tenure denial; and (3) Defendants' articulated reasons for the tenure denial cannot be shown to be mere pretext for retaliation.

At the outset, Defendants urge the Court to grant the motion for summary judgment on the grounds that courts should exercise restraint in reviewing tenure decisions due to the subjective and discretionary nature of the academic institute's decision.  While it is true that many courts have been reluctant to scrutinize academic tenure decisions, universities are by no means

immune from the mandates of Title VII or anti-discrimination laws. *See Carlile v. South Route School Dist. RE-#J*, 739 F.2d 1496, 1500 (10th Cir. 1984). Rather, a university's judgment is entitled to deference only so long as they do not discriminate. Once evidence of discrimination is found, "the University's prerogative to make tenure decisions must be subordinated to the goals embodied in Title VII." *Brown v. Trustees of Boston University*, 891 F.2d 337, 359 (1st Cir. 1989). In examining the merits of Plaintiff's claim, the Court is not acting as a "super-tenure committee" second-guessing the university's decision-making authority, but rather is determining whether Plaintiff has offered sufficient facts to show that the tenure decision was based on impermissible and unlawful grounds.

## A.      Prima Facie Case of Retaliation Under Title VII

### 1.      *Protected Opposition to Title VII Violation*

Defendants argue that Plaintiff's initial EEOC claim does not constitute "protected opposition" because there was no underlying Title VII violation. However, Plaintiff's opposition is protected even if she was not successful in prosecuting her original discrimination charge or if the Defendants' practice did "not actually violate Title VII." *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994); *see also Archuleta v. Colorado Dept. of Institutions*, 936 F2d 483, 487 (10th Cir. 1991); *Fortner v. State of Kansas*, 935 F.Supp. 1252, 1267 (D.Kan. 1996). It is enough that the Plaintiff had a reasonable good faith belief that the employer discriminated. *Id.*; *see also Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984). This broad rule is particularly sound given the frequent dispute among federal courts as to what types of workplace discrimination is protected under Title VII. *See, e.g., Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998) (until resolved by the Supreme Court, there was substantial

disagreement among lower courts whether same sex harassment was prohibited by Title VII).

Here, Defendants argue that the conduct alleged by Plaintiff underlying her initial EEOC charge does not rise to the level of a violation of Title VII.  Rather, Defendants contend that Plaintiff was merely protesting Defendants' decision to not interview her for the English Department position, despite the fact that she was less qualified than the candidate ultimately chosen.  Defendants are erroneous in its assertion that there was no violation of Title VII if the applicant ultimately hired was more qualified than Plaintiff.  Pursuant to 42 U.S.C. § 2000e-2(a), it is a violation for an employer to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee-because of such individual's race, color, religion, sex or national origin."   Title VII provides an individual with the right to be from discrimination throughout the employment selection process.  If the process is discriminatory at any stage, Plaintiff is entitled to relief regardless of her qualifications relative to those ultimately hired.  *See King v. Trans World Airlines, Inc.*, 738 F.2d 255, 257 (8th Cir. 1984); *Ostroff v. Employment Exch., Inc.*, 683 F.2d 302, 304 (9th Cir. 1982) ("when an employer rejects an applicant without considering his or her qualifications, those qualifications are irrelevant to whether the Title VII Plaintiff has raised a prima facie case of disparate treatment"); *Buchanan v. Tower Automotive, Inc.*, 31 F. Supp.2d 644, 654 (E.D.Wis. 1999) (failure to interview based race is a violation of Title VII).  Plaintiff offers sufficient evidence that her initial EEOC charge was in response to the University's refusal to interview her for the English Coordinator position based upon her gender, without regard to her specific qualifications.  Plaintiff was informed by her supervisor that there were enough female faculty members employed in coordinator positions.  In

addition, Plaintiff attests that she was at least as qualified as one of the male candidates ultimately interviewed. Furthermore, the Court finds that Plaintiff had a good faith belief that the University was engaged in actions violative of Title VII.   *See Love*, 738 F.2d at 385. Under these facts, Plaintiff subjectively and quite reasonably believed that she was eliminated from the applicant pool based upon her gender in violation of Title VII.  Thus, Plaintiff has offered sufficient evidence that she engaged in protected opposition to Title VII discrimination.

   2.   *Adverse Employment Action*

   The Tenth Circuit has given a liberal definition to "adverse employment action." *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998); *Berry,* 74 F.3d at 986.  Rather than defining a bright line rule as to what constitutes an adverse employment action, the Tenth Circuit has adopted a "case-by-case approach to determining whether a given employment action is "adverse," examining the unique factors relevant to the case at hand. *Jeffries v. Kansas*, 47 F.3d 1220, 1231-32 (10th Cir. 1998).  "Title VII does not limit adverse job action to strictly monetary losses in the form of wages or benefits." S*anchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998).  Conduct is adverse if it results in a significant change in employment status, or "alters the employee's compensation, terms, conditions or privileges of employment, or adversely affect[s] his [or her] status as an employee." *Id.* at 533 (*quoting Robinson v. Pittsburgh*, 120 F.3d 1286, 1231 (3rd Cir. 1997)).  Examples of adverse employment actions include decisions that have a demonstrable adverse impact on future employment opportunities or performances, including termination, demotions, adverse or unjustified evaluations and reports, transfer or reassignment of duties and failure to promote. *See Conner v. Schnuck Markets, Inc*., 121 F.3d 1390, 1395 (10th Cir. 1997) (termination); *Sauers v.*

*Salt Lake County*, 1 F.3d 1122, 1127-28 (10th Cir. 1993) (reassigned job duties); *Berry*, 74 F.3d

at 986; *O'Neal v. Ferguson*, 35 F. Supp. 2d 832, 835 (D.N.M. 1999) (lateral transfer); *McKenzie*

*v. Atlantic Richfield Co.*, 906 F. Supp. 572, 575 (D.Colo. 1995) (negative evaluations); *but see*

*Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (negative performance evaluations

alone cannot constitute adverse action).  Compiling negative reports of a plaintiff's work

performance or similar heightened scrutiny can also be an adverse employment action, if such

reports and scrutiny adversely affects the employee's job position. *See Roberts v. Roadway Exp.,*

149 F.3d 1098, 1104 (10th Cir. 1998) (pattern of written warnings); *Kim v. Nash Finch Co.*, 123

F.3d 1046, 1060 (8th Cir. 1997) (negative evaluations papering employee's personnel file

negatively affected his job opportunities); *Marx v. Schnuck Markets, Inc.,* 76 F.3d at 329 (pattern

of retaliation began with a negative 'write up'); *Hayes v. Shalala*, 902 F. Supp. 259, 266 (D.D.C.

1995) (reprimands and poor performance ratings establish averse action).

In contrast, "not everything that makes an employee unhappy qualifies as retaliation, for

otherwise, minor and even trivial employment actions...would form the basis of discrimination."

S*anchez*, 164 F.3d at 532 (internal quotations omitted).  Examples of employer actions which do

not constitute adverse employment actions include verbal admonishment, written warnings or

negative evaluations which are later rescinded, and performance reviews which are lower than

previous reviews but still within satisfactory range. *See Fortner v. State of Kansas*, 934 F. Supp.

1252 (D. Kan. 1996), *aff'd* 122 F.3d 40 (10th Cir. 1997). Likewise, "a mere inconvenience or an

alteration of job responsibilities" is not an adverse employment action.  *Sanchez*, 164 F.3d at 533.

Increased tension or unpleasant personal relationships also do not rise to the level of actionable

retaliatory adverse action.  *See Heno v. Sprint/United Management Co.*, 208 F.3d 847 (10th Cir.

16

2000) (no adverse action where plaintiff encountered "chilly response" and a transfer was suggested); *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1381 (10th Cir. 1994) (no adverse action where threat to evaluate teacher more often was not carried out); *Fortner*, 934 F. Supp. at 1268 (no adverse employment action where supervisors' manner towards plaintiff was attributable to "increase of predictable tension in office after a discrimination charge is filed.")

Plaintiff has alleged a number of adverse actions, including the sudden shredding of her student papers, the heightened monitoring as demonstrated by the file documenting her attendance at departmental meetings, the 1994 negative annual performance evaluation, Ms. Rehovec's negative tenure evaluation, the denial of tenure, the adverse rate of pay, and the termination of her employment contract.  Clearly the negative tenure recommendation, the denial of tenure and the termination of her employment contract are adverse employment actions that directly affected Plaintiff's "status as an employee." *Heno,* 208 F.3d at 857.  In particular, the negative tenure recommendation written by Ms. Rehovec alleged that (1) Plaintiff lacked focused direction in professional development; (2) Plaintiff had not demonstrated improved instruction performance; (3) Plaintiff did not heed recommendations to improve herself in the area of composition pedagogy; and (4) Plaintiff's contributions and attendance in the area of community service were uneven and sporadic. These concerns were found to be groundless by the P&T Committee, but nonetheless were echoed in Dr. McLaughlin's and Dean Higbie's recommendations against tenure, as well as the negative tenure recommendations that followed up the administrative chain of command.  As such, the Court is persuaded that Ms. Rehovec's negative tenure recommendation ultimately affected Plaintiff's job position and opportunities.  Likewise, Plaintiff's adverse rate of pay claim, in which she alleges that she received only a 1.75% pay

increase after the denial of her tenure, while all other faculty received a 2% pay increase, is also an adverse employment action which negatively effected Plaintiff's wages or benefits. *See Heno*, 208 F.3d at 857. Defendants argue that the rate of pay claim is not actionable due to the minimal $68.98 amount of wage disparity suffered by the Plaintiff.[4]  However, the Court is not aware of, and Defendants do not cite to any, case law to support the argument that there is a threshold amount of damages required to have an actionable rate of pay claim under Title VII.  There is also sufficient evidence indicating that the 1994 negative performance evaluation was an adverse employment action, in that it was included in the tenure application packet reviewed by the administration who ultimately denied tenure. Although the evaluation was revised in part, Plaintiff alleges that the remaining evaluation was unjustified and unfair.  Her allegation is supported by additional evidence suggesting that the 1994 evaluation subjected Plaintiff to heightened scrutiny of her past performance which was not similarly applied to her co-workers.   Indeed, the evaluation for the first time in Plaintiff's employment cites that she "needs improvement" in two categories. Unfair, negative performance reviews that form the basis of removal of job responsibilities, demotion, trainer or termination are sufficient to satisfy an adverse employment action.  *See Merriweather v. Alabama Dept. of Public Safety*, 17 F. Supp. 2d 1260, 1274-75 (M.D.Ala. 1998).  The heightened scrutiny of Plaintiff's attendance to various departmental and committee meetings also constitutes an adverse employment action. *See Roberts v. Roadway*

---

[4]       Defendants also state that because the rate of pay claim was not included in Plaintiff's September 1994 EEOC charge, she is precluded from pursuing a claim of discrimination on that alleged conduct.  *See Simms v. Dept. of Mental health and Substance Abuse Services,* 165 F.3d 1321, 1326 (10th Cir. 1999).  However, Plaintiff's present cause of action has been raised pursuant to her *third* EEOC charge filed in January, 1995, not her *second* EEOC charge filed in September 1994.  Therefore, the claims alleged in her second EEOC Charge are not dispositive to the present claims brought by Plaintiff.

*Exp.,* 149 F.3d at 1104.  After the filing of the initial EEOC charge, Ms. Rehovec began

scrutinizing Plaintiff's attendance despite the evidence that Plaintiff's attendance was comparable

to several other faculty members.  Plaintiff's lack of attendance was ultimately cited one of the

reasons Ms. Rehovec recommended against tenure for Plaintiff.  A final adverse employment

action includes the submission of incomplete transcripts by Ms. Rehovec to Professor Dasenbrock

when asking him to evaluate Plaintiff's qualifications to teach a certain English class.  Based upon

the incomplete transcripts, Professor Dasenbrock wrote a memorandum concluding that Plaintiff

was not qualified to teach the English course.  This document was later used by Ms. Rehovec in

support of her negative tenure recommendation as evidence of Plaintiff's inadequate

qualifications.

In contrast, the shredding of the student papers do not constitute adverse employment

action since there is no evidence suggesting that this action altered the terms, conditions or

privileges of Plaintiff's employment.  Rather, the shredded papers are more akin to a "mere

inconvenience" and demonstrative of a tense work environment which the Tenth Circuit has held

is not actionable under a Title VII retaliation claim.  *See Heno*, 208 F.3d at 857.  However, the

evidence of the paper shredding is relevant to establishing whether Ms. Rehovec was acting out of

retaliatory motive in the various actions she took against Plaintiff.

    *3.*    *Causal Connection*

Close temporal proximity between the employee's complaint and the employer's adverse

action is a factor in determining whether the employer's proffered reason is a pretext for

retaliation.  *See Pastran v. K-Mart*, 210 F.3d 1201 (10th Cir. 2000).  Plaintiff can establish the

causal connection by "evidence of circumstances that justify an inference of retaliatory motive,

such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071 (1982).  "Close proximity in time may provide some probative evidence of retaliatory intent." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1299 (10th Cir. 1998).  An inference of retaliation based on timing "can only be made, however, where 'close temporal proximity' exists between the bringing of charges and the subsequent adverse action." *Candelaria v. EG & G Energy Measurements, Inc.* 33 F.3d 1259, 1262 (10th Cir. 1994) (*quoting Smith v. Maschner*, 899 F.2d 940, 948-49 (10th Cir. 1990)); *see also Conner*, 121 F.3d at 1395 (four months insufficient to establish causal connection between protected activity and adverse actions); *Richmond v. ONEOK, Inc.*, 120 F.3d 2-5, 209 (10th Cir. 1997) (three months insufficient).  "While retaliatory intent may be inferred from adverse reaction which 'closely followed' [a] Plaintiff's protected activity, 'the phrase closely followed' must not be read too restrictively where *the pattern of retaliatory conduct* begins soon after the [protected activity] and only culminates later in a discharge. *See Marx,* 76 F.3d at 329 (emphasis in original); *O'Neal*, 35 F. Supp.2d at 834 (pattern of retaliatory adverse employment actions established a causal connection).  Where close temporal proximity is lacking, a plaintiff may rely on "additional evidence beyond mere temporal proximity to establish causation. *Conner*, 121 F.3d at 1395.  Such additional indirect evidence can include heightened scrutiny, negative criticism, differential treatment or violation of standard internal protocol and procedures. *Marx,* 76 F.3d at 329 (noting deficiencies in job performance can be evidence of pattern of retaliation); *Raney v. Vinson Guard Service*, 120 F.3d at 1197 (11th Cir 1997) (sudden increase in negative reviews coupled with heightened scrutiny satisfies causal nexus); *see also McClam v. Norfolk Police Dept.*, 877 F.Supp. 277 (E.D. Va. 1995) (divergence from internal protocol is proof of

causation).

Defendants argue that the temporal gap between Plaintiff's's protected opposition and the complained of adverse actions is too great to support a finding of causation.  It is true that a few months passed between the September 1994 EEOC charge and the adverse actions complained of by Plaintiff.  However, notwithstanding this temporal gap, the Court finds that there is sufficient additional evidence supporting a finding of causation.  Although not all of the actions complained of by Plaintiff constitute "adverse employment action," the Court finds that they are relevant to proving causation in this case.  Almost immediately after filing the EEOC complaint in September 1994, Plaintiff was subject to a pattern of retaliatory actions. *See Marx,* 76 F.3d at 329. Specifically, her student papers were destroyed in violation of university protocol.  In addition, she was subject to heightened scrutiny and surveillance, as demonstrated by Ms. Rehovec's December 1994 request for verification that Plaintiff missed a departmental meeting due to other commitments at a university prison project.  Ms. Rehovec began keeping a special file documenting Plaintiff's attendance to meetings, while the attendance of her co-workers was not similarly documented.  In addition, Plaintiff's colleagues were also asked to monitor her actions. In 1994, Plaintiff was also subject to a negative annual performance evaluation for the first time, after her filing of the EEOC charge.  The evaluation was compiled by reviewing Plaintiff's past annual performance evaluations, a practice which was not similarly imposed on Plaintiff's colleagues. The tenor of this negative employment evaluation was apparently so severe and disparate from her prior evaluations that it was finally revised after mediation.  Notwithstanding the revised evaluation, Plaintiff was rated for the first time in her career as needing improvement in two evaluation criteria.  Finally, Plaintiff was subject to a negative tenure review which was

submitted in violation of university protocol. The pattern of retaliation, which included heightened

scrutiny and criticism, divergence from internal procedures, disparate treatment, adverse

evaluation, negative tenure recommendation, denial of tenure, unequal rate of pay and finally

termination from employment, began soon enough after Plaintiff's protected opposition to satisfy

Plaintiff's burden of proving causation.

**2.     Legitimate Non-Discriminatory Reason for the Adverse Action and Evidence of
         Pretext**

Plaintiff having established a prima facie case of retaliation, the burden of production now

shifts to Defendants to proffer a legitimate non-discriminatory reason for the adverse employment

action.  Defendants focus exclusively on the denial of tenure and Plaintiff's termination, arguing

that these actions were justified by Plaintiff's poor work performance.  Defendants argue that

despite the satisfactory annual reviews, Plaintiff did not meet the standards required for a tenured

professor.  Specifically, Defendants contend that Plaintiff demonstrated  poor professional

development, lack of background in compositional theory and practice, poor instructional skills,

and a lack of contribution or leadership in community services.

Plaintiff in turn argues that these proffered justifications lack basis in fact and are merely a

pretext for retaliation.  A plaintiff demonstrates pretext by showing either "that a discriminatory

reason more likely motivated the employer or...that the employer's proffered explanation is

unworthy of belief."  *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994)

*(quoting Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  Pretext may

be proven where the evidence highlights "such weaknesses, implausibilities, inconsistencies,

incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact finder could rationally find them unworthy of credence."  *Pastran*, 210 F.3d at

1206.  An employer's stated reason for its adverse treatment of a retaliation plaintiff has been shown to be pretextual where the employer's excuse of poor performance was inconsistent with the employer's rating of the employee prior to the time of the protected activity, where surveillance of the employee increased greatly following the employee's protected act, and where an employee is treated differently than co-workers.  *See Strother v. Southern Cal. Permanente Med. Group*., 79 F.3d 859, 870 (9th Cir. 1996) (pretext found where employer had praised employee for her interpersonal skills and later terminated her for poor interpersonal skills); *Holland v. Jefferson Nat'l Life Ins. Co*., 883 F.2d 1307 (7th Cir. 1989) (plaintiff, unlike other employees, denied the right to return to work after leave of absence); *Miller v. Fairchild Indus*., 885 F.2d 498, 506 (9th Cir. 1989) (plaintiffs were laid off rather than being given the opportunity to transfer as had other employees); *Crawford v. Roadway Express, Inc*., 485 F. Supp 914 (W.D. La. 1980) (heightened surveillance indicates pretext).  Temporal proximity is also a factor to be considered in determining pretext.  *See Burrus,* 683 F.2d at 343 (three years too long of temporal gap to prove pretext).

In combination with the temporal proximity of the pattern of retaliatory actions, the evidence - although not conclusive - raises an issue of material fact as to whether Defendants offered a pretextual reason for denying tenure to Plaintiff.   Plaintiff offers much evidence which tends to show that her employer acted with a retaliatory motive.  Although Defendants cite Plaintiff's poor work performance as the primary justification for the denial of tenure, the credibility of this proffered motive has been challenged sufficiently for Plaintiff to survive summary judgment.  First, there is genuine grounds for dispute as to whether the grounds cited for the denial of tenure were indeed justified.  In the 1994 annual evaluation, Ms. Rehovec cited

Plaintiff for a lack of pedagogy in composition theory and practice.  This concern was echoed in Ms. Rehovec's negative tenure evaluation, as well as the negative tenure recommendations of Dr. McLaughlin and Dean Higbie.  However, in her rebuttal to the 1994 annual evaluation, Plaintiff points out several courses through which she gained additional training in composition theory and practice including a course in the Department of Curriculum and Instruction entitled "Educational Experimentation" and two courses in the English Department, "Theories of Discourse: Gender and Language" and "Computers and Writing."  Several faculty members at DABCC also attested to Plaintiff's qualifications and eligibility for tenure.  The English Coordinator, Dr. Kline believed that Plaintiff should have been granted tenure and advised Ms. Rehovec of such.  Dr. Kline believes that Ms. Rehovec's negative tenure recommendation was not in fact based on Plaintiff's performance.  Likewise, the P&T Committee twice recommended Plaintiff for tenure, after carefully reviewing Ms. Rehovec's negative recommendation and finding her allegations completely groundless.  For example, with respect to Ms. Rehovec's allegation that Plaintiff lacked background in composition practice and theory, one member of the P&T Committee observed that Plaintiff had the strongest background and training in rhetorical composition among all the faculty.  Similarly, Plaintiff's expert witness, Dr. Harris, attests that the proffered reasons for Plaintiff's denial of tenure are not substantiated by Plaintiff's performance record and she should thus have been granted tenure.

Plaintiff has also offered evidence demonstrating procedural irregularities which suggest a retaliatory motive.  The most clear violation of university procedure is that Ms. Rehovec placed her negative tenure recommendation in Plaintiff's tenure application notebook without first providing the recommendation to Plaintiff so that she may have an opportunity to submit a

rebuttal.  In fact it was not until three months later that Plaintiff obtained a copy of the negative

tenure recommendation.  The P&T Committee was especially surprised to see the negative tenure

recommendation without a rebuttal from the tenure applicant, and assumed that Plaintiff had

chosen not to respond.  Although, ultimately the P&T Committee rejected the negative

recommendation, Ms. Rehovec's divergence of university procedure suggests that she was

attempting to deprive Plaintiff of a fair tenure application process due to a retaliatory motive.

Even more telling, one member of the P&T Committee attests that although the P&T

recommendation is non-binding, it is generally considered the "strongest" recommendation of the

tenure process.  Dr. Harris also asserts that P& T Committee decisions are typically awarded

more deference than was given in Plaintiff's case. The fact that it was quite unusual for the faculty

and administration to give so little deference to the P&T Committee's unanimous

recommendation undermines Dr. McLaughlin's assertion that the opinion of  Ms. Rehovec was

far more important to him than that of the P&T Committee.

     The Defendants' proffered reasons for denying tenure to Plaintiff are inconsistent with

past evaluations she received during the course of her employment, thus giving rise to an

inference of pretext. *See Strother*, 79 F.3d at 870.  In recommending against tenure for Plaintiff,

Ms. Rehovec, Dr. McLaughlin and Dean Higbie all concur that Plaintiff failed to demonstrate

leadership contribute to campus committee and community service project.  However, throughout

the annual evaluations, Plaintiff was praised  for her participation in departmental activities and

her community service contributions.  In 1992, Ms. Rehovec commended Plaintiff for "getting

involved in community college activities."  She also noted that "I am impressed with the

professional organizations you are associated with...."  In prior evaluations Plaintiff's enthusiasm

for departmental activities and meetings, as well as her affiliation with professional associations was noted.  Defendants also contend that Plaintiff failed to develop her instructional skills.  However, the annual evaluations indicate that Plaintiff routinely received high student evaluations and was commended for her innovative work with collaborative learning techniques.   Likewise, the P&T Committee was quite surprised to see the negative tenure recommendation given that Plaintiff had been making normal progress towards tenure throughout her employment and that the denial of tenure was inconsistent with her past evaluations.

Additional evidence of pretext is demonstrated by the heightened scrutiny and differential treatment to which Plaintiff was subjected.  Subsequent to filing the initial 1994 EEOC charge, Ms. Rehovec began keeping a special folder documenting Plaintiff's attendance at departmental meetings, despite evidence suggesting that her attendance was comparable to that of other faculty members.  Ms. Rehovec also asked other faculty members for negative feedback regarding Plaintiff, a practice which was not applied universally.  Dr. Kline notified the administration of the differential treatment subjected on Plaintiff in that Ms. Rehovec intensely scrutinized Plaintiff's work and sought addition negative input from the faculty.  In addition, Plaintiff's student papers were shredding in divergence form departmental procedure.  Such heightened scrutiny and differential treatment indicates that Ms. Rehovec was acting out of a retaliatory mind set and intended to create a difficult work environment for Plaintiff.

Defendants erroneously assert that all of the faculty members involved in her denial of tenure would have to possess some retaliatory motive in order for Plaintiff to prove pretext.  However, under the facts of this case it is clear that the negative tenure recommendation of Ms. Rehovec had repercussions throughout the entire tenure process and tainted Plaintiff's

application.  It appears to the Court that the concerns voiced by Ms. Rehovec were essentially ratified by the remainder of the tenure review faculty, without scrutiny of the factual basis underlying the negative assessment of Plaintiff's qualifications.  Moreover, the Appeals Board appears to have focused exclusively on procedural irregularities that occurred during the tenure review process, rather than on the merits of Plaintiff's tenure qualifications.   Thus, it is evident that once the negative tenure recommendation was made, it adversely influenced the entire application process.  Plaintiff has demonstrated that there is a genuine issue of material fact as to whether the negative recommendation was retaliatory and whether the proffered justification for the denial of Plaintiff's tenure application were in fact pretextual.  As such, she has sustained her burden of proof, rendering summary judgment in favor of Defendants inappropriate.

## CONCLUSION

The Court is satisfied that Plaintiff has raised a genuine issue of fact as to whether she was denied tenure and terminated in retaliation for protected Title VII opposition.

**WHEREFORE,**

**IT IS THEREFORE ORDERED**  that Defendants' Motion for Summary Judgment Regarding Retaliatory Discharge, filed December 10, 1999 **[Doc. No. 53]** is **HEREBY DENIED.**

**DATED** this 11th day of July, 2000.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


Attorney for Plaintiff                              Attorney for Defendants
Chris Key                                               Raul Carrillo Jr.
                                                            Thomas Sandenaw